**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| NADIA MOKHTAR, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 12-1734 (RC) |
| | : | | |
| v. | : | Re Document No.: | 87 |
| | : | | |
| JOHN F. KERRY, in his official capacity | : | | |
| as Secretary of State | : | | |
| | : | | |
| Defendant. | : | | |

**<u>MEMORANDUM OPINION</u>**

**<span style="font-variant:small-caps">Granting Defendant's Motion for Summary Judgment</span>**

**I.  INTRODUCTION**

Plaintiff Nadia Mokhtar, an employee at the United States Department of State (the "Department"), brings this lawsuit *pro se*[1] against John F. Kerry, in his official capacity as Secretary of the Department, alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act ("ADEA") during the course of her employment.  Now before the Court is the Department's motion for summary judgment, through which the Department seeks judgment in its favor on the grounds that, first, Mokhtar failed to administratively exhaust many of her discrimination and retaliation claims before filing suit, and second, those remaining claims that were exhausted fail on the merits.  For the reasons explained

---

[1]       Although Mokhtar filed her lawsuit *pro se*, she received assistance from an attorney in preparing her opposition to the Department's motion for summary judgment.  *See* Pl.'s Mem. Opp'n Mot. Summ. J., ECF No. 100, at 1 n.1.  The attorney's representation was limited to providing editorial advice in regard to the opposition brief, and Mokhtar retained control over the final document.  The attorney does not otherwise represent Mokhtar and will not enter an appearance in this case on her behalf, and the Court therefore will continue to treat Mokhtar as a *pro se* litigant.

below, the Court will grant the Department's motion.  In doing so, the Court denies some relief

requested within the Department's administrative exhaustion analysis, but ultimately, the Court

concludes that none of Mokhtar's remaining claims survive summary judgment on the merits.

## II.  FACTUAL BACKGROUND

Mokhtar, a sixty-seven year-old female, was at all relevant times, and remains today, a

GG-11 Language and Culture Instructor at the Foreign Service Institute ("FSI") of the State

Department in the School of Language Studies, Near Eastern Central, and South Asian

Languages Division.  *See* Report of Investigation ("ROI") Excerpts, ECF No. 87-3, Ex. A at 24-

25, 59, 122-23.  Dr. Tagesir Elrayah, a GG-14 Supervisory Language Training Specialist, has

been Mokhtar's first-line supervisor since October 2006.  *See id*. at 58-59.  Dr. James Bernhardt,

a GG-15 Division Director, has been Mokhtar's second-line supervisor since 1993, except for a

period from approximately 2002 to 2006, *see id*. at 96, which was when Mokhtar was assigned to

work overseas as a Deputy Consular Officer.  *See* Mokhtar Depo., ECF No. 87-4, Ex. B at 14:2-

25.  Mokhtar returned to work as a Language and Culture Instructor at the FSI's School of

Language Studies after her overseas assignment concluded.  *See id*.

### A.  Individualized Refresher Training Plan And Recertification

According to the description for the Language and Culture Instructor position, Mokhtar's

responsibilities include "administer[ing] proficiency tests, both in the capacity of a tester and

examiner[.]"  ROI Excerpts, ECF No. 87-3, Ex. A at 124.  Also according to the position

description, Mokhtar's role as a Language and Culture Instructor requires her to possess "[s]kill

in administering FSI language proficiency tests."  *Id*. at 125.  While Mokhtar was working

overseas as a Deputy Consular Officer, the "procedures, policies, and practices" for

administering language proficiency examinations changed.  *See id*. at 60, 84.  In addition,

between 2008 and January 2011, the FSI required that all testers and examiners get recertified, which Mokhtar had not done.  *See id.* at 71-73; Mokhtar Depo., ECF No. 87-4, Ex. B at 132:9-15.

In March 2008, Philippe Casteuble, an employee in the School of Language Studies' Continuing Testing and Training ("CTT") unit who was responsible for validating test scores as a quality control measure, observed that Mokhtar, when serving as an examiner during several FSI language proficiency tests between May 2007 and March 2008, scored the tests in a way that was contrary to the new procedures in place at that time.  *See* ROI Excerpts, ECF No. 87-3, Ex. A at 60, 78, 85-86; *see also* Casteuble Depo., ECF No. 87-5, Ex. C at 11:5-11:25; Hoffman Depo., ECF No. 87-6, Ex. D at 21:5-8.  For example, Mokhtar used non-standard testing practices as an examiner, and her testing decisions did not support the test scores that she was issuing.  *See* ROI Excerpts, ECF No. 87-3, Ex. A at 78, 85.  As a result, the test scores that Mokhtar had issued could not be validated by Casteuble.  *See id.* at 78, 85-86.  According to Dr. Elrayah, Mokhtar's scoring errors continued even though Casteuble had "met with her and discussed the [scoring] procedures after the initial tests."  *Id.* at 78.

On March 14, 2008, during a meeting attended by Mokhtar and Dr. Elrayah, Casteuble recommended that Mokhtar attend refresher training courses before she administrated any more tests.  *See id.*  In response, Mokhtar insisted that she did not want to attend the same training courses as new FSI employees and contractors, but she agreed to attend Individualized Refresher Training courses as an alternative.  *See id.* at 85; Mokhtar Depo., ECF No. 87-4, Ex. B at 130:6-14, 142:9-16, 147:24-148:1.  As a result, CTT personnel sent an examiner and tester Individualized Refresher Training plan to Mokhtar and discussed the plan with her.  *See* ROI Excerpts, ECF No. 87-3, Ex. A at 77-80, 87; Mokhtar Depo., ECF No. 87-4, Ex. B at 142:9-16.

As of June 2010, however, Mokhtar had not completed the examiner portion of the Individualized Refresher Training plan. *See* ROI Excerpts, ECF No. 87-3, Ex. A at 88; Mokhtar Depo., ECF No. 87-4, Ex. B at 146:11-21. Thus, on June 14, 2010, CTT personnel informed Dr. Elrayah that Mokhtar had not complied with, nor responded to, the examiner training plan that was sent to her in March 2008. *See* ROI Excerpts, ECF No. 87-3, Ex. A at 84, 88.

On July 14, 2010, Mokhtar signed a mid-year performance review form that was presented to her by Dr. Elrayah in which she agreed to obtain both the testing and language examiner recertifications before the end of the ratings year in December 2010. *See id.* at 61, 118; Mokhtar Depo., ECF No. 87-4, Ex. B at 117:23-118:9. Mokhtar had completed the testing recertification in April 2010, but she did not complete the examiner recertification by the end of 2010. *See* ROI Excerpts, ECF No. 87-3, Ex. A at 60; Mokhtar Depo., ECF No. 87-4, Ex. B at 119:21-120:5. For example, Mokhtar failed to properly administer an exam under observation as part of the examiner recertification, *see* Mokhtar Depo., ECF No. 100-1, Ex. 3 at 87:17-88:20, and she made other examiner errors as well. *See* Mokhtar Depo., ECF No. 87-4, Ex. B at 148:16-22. Mokhtar has acknowledged that in 2010, she was expected to perform testing and examining as part of her job duties and for her end-of-year performance review. *See id.*; Mokhtar Depo., ECF No. 100-1, Ex. 3 at 149:1-18.

## B. Non-Selection For Unspecified Promotions And Volunteer Positions

On June 15, 2010, Mokhtar mentioned to Dr. Elrayah during a meeting and in a follow-up email that she was not selected for two management positions for which she had applied, though the names of those positions were not provided. *See* ROI Excerpts, ECF No. 87-3, Ex. A at 82. In addition, Mokhtar complained to Dr. Elrayah that she was not respected by the section and that she had been humiliated through the denial of her promotions for these unspecified

positions.  *See id.*  Mokhtar also expressed during this meeting that she was more qualified for

the positions than those whom were selected.  *See id.*  In her deposition, Mokhtar stated that she

applied for two unnamed positions outside the FSI sometime in 2007 and 2008, and that she has

not applied for any other positions since then.  *See* Mokhtar Depo., ECF No. 87-4, Ex. B at

179:23-180:20, 190:3-20.  Additionally, Mokhtar was denied the opportunity to take a volunteer

position in Iraq in 2008.[2]  *See* Mokhtar Depo., ECF No. 100-1, Ex. 3 at 24:9-23, 170:1-8.

### C.  Consular Training Module Project

Around August and September 2010, Mokhtar began working on a consular training

module project in which she attempted to prepare a training module that would be used to teach

the Egyptian Arabic dialect.  *See* ROI Excerpts, ECF No. 87-3, Ex. A at 41-56.  Mokhtar was not

assigned this module project by anyone at the FSI, but rather came up with the idea on her own.

*See* Mokhtar Depo., ECF No. 100-1, Ex. 3 at 28:1-4.  Her tasks for this project included

preparing the content and setting up audio and video recordings.  *See id.* at 28:6-10; ROI

Excerpts, ECF No. 87-3, Ex. A at 53; Mokhtar Aff., ECF No. 100-1, Ex. 4 at ¶ 9.  Before

Mokhtar could complete the project, however, FSI received authorization to simultaneously

develop uniform consular training modules for all Arabic dialects.  *See* Bohsali Depo., ECF No.

87-7, Ex. E at 12:8-13:1.  FSI then started a new development project for a consular module that

was designed for multiple dialects, and FSI also cancelled the development of Mokhtar's

Egyptian Arabic-specific dialect module, which did not follow the same design as the multi-

dialect module.  *See id.*  An Egyptian Arabic-specific module project was restarted a few months

---

[2]         Mokhtar also alleges that she was not selected for a volunteer position at a
passport office in 2007, *see* Compl., ECF No. 1 at 5, but the Court finds no evidence of this in
the record.

later with Dalia Abdelmaguid in charge.  *See* Mokhtar Depo., ECF No. 100-1, Ex. 3 at 36:8-18,

37:7-10.

### D.  Confrontation With A Student And Failure To File A Report

In December 2010, Mokhtar was involved in a verbal altercation with a School of

Language Studies student regarding a classroom reservation.  *See* ROI Excerpts, ECF No. 87-3,

Ex. A at 92-93.  Mokhtar and the student later resolved the matter through a mediation session.

*See* Mokhtar Depo., ECF No. 87-4, Ex. B at 166:4-7, 167:21-168:4.  Following this incident, the

student informed Dr. Elrayah that Mokhtar had missed two language consultation appointments.

*See* ROI Excerpts, ECF No. 87-3, Ex. A at 89-91; Mokhtar Aff., ECF No. 100-1, Ex. 4 at ¶ 5.

On January 4 and January 7, 2011, Dr. Elrayah asked Mokhtar to provide him with a report of

her learning consultation meetings with students in 2010, including the number of meetings she

scheduled, conducted, and missed with each of the students who were assigned to her as their

learning consultant.  *See* ROI Excepts, ECF No. 87-3, Ex. A at 91.  Dr. Elrayah explained that

this report would be considered as part of Mokhtar's performance evaluation for the 2010 ratings

year.  *See id.*  As of January 20, 2010, Mokhtar had not provided the report to Dr. Elrayah.  *See

id.* at 89-91.

### E.  2010 Performance Evaluation

On January 26, 2011, Dr. Elrayah issued Mokhtar's 2010 performance evaluation, which

rated Mokhtar as "Not Successful" in two "critical performance" elements: demonstrating "job

knowledge" and "interpersonal skills and communication."  *Id.* at 111, 114.  According to the

evaluation form, a "Not Successful" rating is appropriate when "[t]he quality and quantity of the

employee's work under this element are not adequate" and "[t]he employee's work products fall

short of requirements."  *Id.* at 111.  Because she received "Not Successful" performance ratings,

Mokhtar received an overall, "summary level" rating of "Not Successful" for the 2010 ratings year. *Id.* at 116.

In Dr. Elrayah's narrative summary for the 2010 performance evaluation, he provided the following reasons for his rating decisions: "Mokhtar did not keep good track of her consultees … and poorly communicated with her supervisor in this matter"; "Mokhtar was re-certified as [a] tester, and started toward an examiner re-certification[, but] [s]he missed some scheduled tests during the year and did not get her recertification as [an] examiner before the end of 2010, as stipulated in her mid-year review"; there "were concern[s] about the interpersonal skills and communication level of [Mokhtar] during this rating year[, and] [s]he missed some consultation sessions with her students without rescheduling or talking with the students"; and Mokhtar "did not keep complete records of her consultees, and did not respond in [a] timely manner to her supervisor's requests to provide [a] complete consultation report that reflects scheduled, conducted, and missed [Learning Consultation] sessions." *Id.* at 115.

After receiving the evaluation, Mokhtar submitted a "request for a higher level review by the reviewing official," and Dr. Bernhardt then reviewed the performance evaluation. *See id.* at 117. On February 16, 2011, Dr. Bernhardt approved the "Not Successful" ratings, explaining in his comments: "We expected Mokhtar to complete her recertification as an examiner. She did not do that. Her work as a language consultant and her record keeping for that job were also less than successful." *Id.*

### F.  Failure To Receive An Award For Work During The 2010 Ratings Year

The FSI's policy regarding discretionary performance awards provides that such awards are intended "to provide appropriate incentives and recognition for employees to encourage and reward outstanding performance," and "it is essential that monetary awards be given only to

those employees who are exceptionally deserving." *Id*. at 94. Neither Dr. Elrayah nor Dr. Bernhardt nominated Mokhtar for an award based on her performance during the 2010 ratings year. *See id*. at 66, 104. Dr. Elrayah explained that he did not nominate Mokhtar because her "performance in [2010] was not successful." *Id*. at 66. Similarly, Dr. Bernhardt explained that "[a]wards are not automatic and are not entitlements[,]" and "[i]t is not likely that an award would have been [given] to Mokhtar … even if Dr. Elrayah had written a nomination for her since Mokhtar's Performance was rated 'Unsuccessful' for the previous rating year." *Id*. at 104, 106. Dr. Bernhardt also noted that the FSI's "award committee often verifies performance ratings when considering awards and has been known to turn down awards when the ratings are low." *Id*. at 106. Thus, Mokhtar did not receive an award for her work during the 2010 ratings year when the awards were announced on July 20, 2011. *See id*. at 103.

### G.  Procedural History: Administrative Process And Civil Complaint

On January 13, 2011, Mokhtar initiated contact with an Equal Employment Opportunity ("EEO") counselor, and on March 2, 2011, she filed a formal EEO complaint. *See id.* at 1-2, 5. In her EEO complaint, Mokhtar checked the boxes for discrimination based on age and reprisal. *See id*. at 2. In the space provided to explain how she was discriminated against, Mokhtar discussed her "Not Successful" performance ratings and her inability to complete the consular module project she had been authoring. *See id*.

On May 13, 2011, the Department, through its Office of Civil Rights, issued a letter to Mokhtar accepting the following claims for investigation (the "acceptance-of-claims letter"):

> Because of your age … and reprisal (prior protected EEO activity), you were discriminated against when:
>
> 1.  You were issued a "Not Successful" rating on your 2010 performance evaluation; and

2.  You were subjected to a hostile work environment characterized by, but not limited to, false accusations.

*Id*. at 16.  On August 15, 2011, in response to correspondence from Mokhtar dated July 14, 2011, the Department issued a second letter in which it accepted a third claim for investigation:

3.  As an act of reprisal, you were discriminated against when you did not receive awards on July 20, 2011.

*Id*. at 21.  An administrative investigation was conducted between March 2, 2011, and February 1, 2012, and a Report on Investigation was sent to Mokhtar in a letter dated February 22, 2012. *See* Final Agency Decision, ECF No. 87-8, Ex. F at 2.  The Department issued a Final Agency Decision on September 26, 2012, concluding that Mokhtar had "not established her claims of discrimination" or hostile work environment.  *Id*. at 8.

On October 24, 2012, Mokhtar filed a complaint in this Court asserting various allegations about her time at the Department.[3]  *See generally* Compl., ECF No. 1.  Although the statutory bases for her claims are somewhat unclear, the Court is cognizant of the need to "liberally construe[]" the complaint because Mokhtar is a *pro se* plaintiff.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  As such, the Court finds that Mokhtar is asserting the following statutory claims for relief: (1) age discrimination under the ADEA based on discrete acts; (2) reprisal under Title VII and the ADEA based on protected activity; and (3) hostile work environment under Title VII and the ADEA.

---

[3]     Mokhtar's complaint named several Department employees as defendants, but on September 23, 2014, the Court granted the Department's motion to dismiss all defendants other than the Secretary of the Department, as only the head of the Department is the appropriate defendant in Title VII and ADEA actions.  *See* Mem. & Order, ECF No. 95.

## III.  LEGAL STANDARD

Summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  *Liberty Lobby, Inc.*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Holcomb*, 433 F.3d at 895.  When Rule 56 is invoked, the moving party has the initial burden of demonstrating the absence of a genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When the moving party does not bear the burden of persuasion at trial, its burden "may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case."  *Id*. at 325.

Once the moving party has met its burden, the nonmoving party, to defeat the motion, must designate "specific facts showing that there is a genuine issue for trial."  *Id*. at 324 (citation omitted).  Though courts must view this evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *see Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 23-24 (D.C. Cir. 2013), the nonmoving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his position — "there must be evidence on which the jury could reasonably find for [the nonmoving party]."  *Anderson*, 477 U.S. at 252.  The nonmoving party, moreover, "may not rest upon mere allegation or denials of his pleading but must present affirmative evidence showing a genuine issue for

trial." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (internal citation and quotation marks omitted).

Of particular relevance here, this Court has explained that "[s]ummary judgment for a defendant is most likely when a plaintiff's claim is supported solely by the plaintiff's own self-serving, conclusory statements." *Bonieskie v. Mukasey*, 540 F. Supp. 2d 190, 195 (D.D.C. 2008) (citations omitted).  That is because "conclusory allegations" and "unsubstantiated speculation," whether in the form of a plaintiff's own testimony or other evidence submitted by a plaintiff to oppose a summary judgment motion, "do not create genuine issues of material fact." *Id.* at 200 n.12 (internal citation and quotation marks omitted); *Sage v. Broad. Publ'ns, Inc.*, 997 F. Supp. 49, 53 (D.D.C. 1998) ("Conclusory allegations made in affidavits opposing a motion for summary judgment are insufficient to create a genuine issue of material fact.").

Finally, although the pleadings of a *pro se* party are to be "liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers," *Erickson*, 551 U.S. at 94 (internal citation and quotation marks omitted), "[t]his benefit is not … a license to ignore the Federal Rules of Civil Procedure[.]" *Sturdza v. United Arab Emirates*, 658 F. Supp. 2d 135, 137 (D.D.C. 2009) (citations omitted). Accordingly, in the context of Rule 56, a "*pro se* plaintiff must meet his burden of proving that there exists a genuine dispute as to a material fact to survive a motion for summary judgment."[4]

---

[4]   As an initial evidentiary matter, Mokhtar attaches to her opposition brief several affidavits from apparent co-workers in an attempt to buttress her claims, but these affidavits are so conclusory and lacking in factual specificity that they cannot create genuine disputes of material fact at summary judgment. *See, e.g.*, *Meijer v. Biovail Corp.*, 533 F.3d 857, 865 (D.C. Cir. 2008) ("Although, as a rule, statements made by the party opposing a motion for summary judgment must be accepted as true for the purpose of ruling on that motion, some statements are so conclusory as to come within an exception to that rule." (citation omitted)); *Ruiz v. U.S. Dep't of Justice*, 636 F. Supp. 2d 85, 88 (D.D.C. 2009) ("In opposing a summary judgment motion, plaintiff may not replace conclusory allegations of the complaint or answer with conclusory

*Neuman v. United States*, No. 13-CV-0719, 2014 WL 4922584, at *4 (D.D.C. Sept. 30, 2014)

(citations omitted); *see also Parr v. Ebrahimian*, No. CV 07-1718, 2014 WL 4828198, at *2 n.2

(D.D.C. Sept. 30, 2014) (although a *pro se* plaintiff's "pleadings are read liberally, the same

summary judgment standard applies, notwithstanding her *pro se* status" (citations omitted)).

## IV.  ANALYSIS

In language parallel with Title VII, the ADEA provides, in relevant part, that "[a]ll

personnel actions affecting employees or applicants for employment who are at least 40 years of

age … in executive agencies … shall be made free from any discrimination based on age."  29

U.S.C. § 633a(a).  In addition, both Title VII and the ADEA prohibit federal agencies from

retaliating against an employee for engaging in protected activity, *see Holcomb*, 433 F.3d at 901;

*Forman v. Small*, 271 F.3d 285, 297-99 (D.C. Cir. 2001), and from creating a hostile work

environment based on an employee's membership in a protected class.  *See Blackwell v. SecTek,*

*Inc.*, No. CV 13-1536, 2014 WL 3834984, at *9 n.9 (D.D.C. Aug. 5, 2014); *Adams v. District of*

*Columbia*, 740 F. Supp. 2d 173, 187-88 (D.D.C. 2010).

The Supreme Court has cautioned courts that these federal employment discrimination

statutes are not intended to be used as "general civility code[s]" for dissatisfied employees,

*Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998), nor do such statutes permit courts to

---

allegations of an affidavit[.]" (internal citation and quotation omitted)); *Miller v. Rosenker*, 578
F. Supp. 2d 107, 113 (D.D.C. 2008) ("A plaintiff cannot survive a motion for summary judgment
simply by making a conclusory, unsubstantiated claim in hopes that he can manufacture a
genuine issue of material fact where none exists.").  This includes the Alsomali Affidavit, *see*
ECF No. 100-1, Ex. 11, the Demy Affidavit, *see id*. Ex. 12, the Salagh-Massey Affidavit, *see id*.
Ex. 13, and the Stanom Affidavit, *see id*. Ex. 14.  Each affidavit describes in conclusory terms
"witnessing" age discrimination or favoritism at the FSI without providing a single example or
any other basic supporting facts, such as the name of any younger employee who was favored
and in what context.  As such, these affidavits offer very little, if any, evidentiary value when
resolving the Department's motion for summary judgment.

act as "super-personnel departments that reexamine an entity's business decisions." *Holcomb*, 433 F.3d at 897 (internal citation, quotation, and alterations omitted). But that is exactly what Mokhtar seeks here. Thus, whether framed as discrete-act discrimination claims, retaliation claims, or hostile work environment claims, the Court concludes that Mokhtar fails to establish any legally cognizable workplace harm, but rather only the "ordinary tribulations of the workplace" for which there is no statutory remedy. *Faragher*, 524 U.S. at 788. Accordingly, the Court will rule as follows: first, the Court will grant summary judgment for the Department as to those claims that Mokhtar failed to administratively exhaust before filing this lawsuit; and second, the Court will grant summary judgment for the Department as to the merits of each remaining Title VII and ADEA claim. In the end, none of Mokhtar's claims survive the Department's motion.

### A. Failure To Exhaust Administrative Remedies Under Title VII And The ADEA

Before bringing a Title VII or ADEA claim in federal court, a federal employee must initiate informal contact with an Equal Employment Opportunity Commission ("EEOC") counselor within forty-five days of the alleged discriminatory conduct.[5] *See* 42 U.S.C. § 2000e-16(c) (Title VII); 29 U.S.C. §§ 633a(b)-(c) (ADEA); 29 C.F.R. § 1614.105(a)(1) (providing EEOC procedures for federal employees); *see also Arnold v. Jewell*, No. CV 05-1475, 2013 WL 6730918, at *3-4 (D.D.C. Dec. 23, 2013). If the EEOC counseling does not resolve the matter, the federal employee must then file a formal discrimination complaint with the agency within

---

[5]     An alternative path to the federal courthouse exists under the ADEA. Specifically, a federal employee may bring the claim directly to federal court if she gives the EEOC written notice of the intent to sue within 180 days of the allegedly discriminatory act and then waits at least thirty days to file the action. *See* 29 U.S.C. § 633a(d); *Wiggins v. Powell*, No. CIV.A.02-1774, 2005 WL 555417, at *13 (D.D.C. Mar. 7, 2005) (discussing exhaustion under the ADEA). Here, there is no evidence that Mokhtar provided notice to the EEOC under the ADEA; accordingly, the Court assesses exhaustion under the relevant EEOC regulations for federal employees. *See* 29 C.F.R. §§ 1614.105, 1614.106.

fifteen days of receiving notice from the EEOC counselor about the right to file such a complaint. *See* 29 C.F.R. §§ 1614.105(d), 1614.106(b).

Failure to exhaust administrative remedies under Title VII and the ADEA is an affirmative defense, not a jurisdictional requirement, and the burden therefore falls on the defendant to plead and prove the defense. *See Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1996); *Koch v. Walter*, 935 F. Supp. 2d 143, 150 (D.D.C. 2013); *Pearsall v. Holder*, 610 F. Supp. 2d 87, 95 (D.D.C. 2009). If the defendant succeeds in meeting its burden, the burden then shifts to the plaintiff to put forth evidence that would justify the equitable avoidance of the defense. *See Rann v. Chao*, 346 F.3d 192, 195 (D.C. Cir. 2003); *Noisette v. Geithner*, 693 F. Supp. 2d 60, 68 (D.D.C. 2010). For exhaustion purposes, the EEO charge encompasses claims that are "like or reasonably related to the allegations of the charge and growing out of such allegations." *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (citation omitted). To be sufficiently related in this manner, a claim "must arise from 'the administrative investigation that can reasonably be expected to follow the charge of discrimination.'" *Id.* (citation omitted).

Here, the Department moves for summary judgment on the basis that nearly all of the allegations in Mokhtar's complaint were not alleged in, and are not reasonably related to, the claims in her EEO complaint such that they were not administratively exhausted. *See* Def.'s Mem. Supp. Mot. Summ. J., ECF No. 87-2, at 7-9. Specifically, the Department seeks summary judgment in regard to potential discrete-act age discrimination and reprisal claims based on the following allegations from the complaint:

- New employees are "too young" and are not dressed "professionally";
- Dr. Elrayah "made" Mokhtar sign a document stating that she would get recertified;
- Dr. Bernhardt persuaded CTT employees to prevent Mokhtar from getting recertified;
- Dr. Bernhardt required employees to implement his policies and follow his instructions;
- Management did not permit Mokhtar to complete a consular module project;

- Dr. Bernhardt did not involve Mokhtar in developmental assignments;
- Dr. Bernhardt attempted to prevent Mokhtar from volunteering for positions outside of the FSI in 2007 and 2008;
- Dr. Bernhardt did not assign projects to Mokhtar; and
- Dr. Bernhardt did not select Mokhtar for two supervisory positions in 2007 and 2008.

*See id.* at 9 (citing Compl., ECF No. 1 at 2-6). Separately, the Department seeks summary judgment based on Mokhtar's failure to seek timely EEO counseling regarding her allegations that she was not selected for two unspecified supervisory positions in 2007 and 2008, and that she was prevented from undertaking volunteer positions in a passport office in 2007 and in Iraq in 2008. *See id.* at 10-11 (citing Compl., ECF No. 1 at 5-6).

### 1.  Exhaustion: Cancellation Of The Module Project

According to the agency's acceptance-of-claims letters, the administrative investigation into Mokhtar's EEO complaint was limited to the following claims: (1) discrete-act age discrimination and reprisal based on Mokhtar's 2010 performance ratings; (2) an allegedly hostile work environment characterized by "false accusations"; and (3) discrete-act age discrimination and reprisal based on Mokhtar not receiving a performance award in July 2011. *See* ROI Excerpts, ECF No. 87-3, Ex. A at 16, 21. In the narrative section of the EEO complaint, however, Mokhtar explicitly alleged another example of age discrimination and retaliation: Dr. Bernhardt's decision to cancel the consular module project on which Mokhtar had been working.[6] *See id.* at 2. Additionally, in the next section of the EEO complaint that asks about

---

[6]    There is some uncertainty about whether Mokhtar was asserting a discrete-act claim based on age discrimination and reprisal as to the module project, or whether the project was one act constituting a hostile work environment claim, or both. This confusion arises in part because the agency agreed to investigate a hostile work environment charge "characterized by … false accusations," ROI Excerpts, ECF No. 87-3, Ex. A at 16, and Mokhtar's EEO investigative affidavit seems to treat the module project as one example of "false accusations." *See id.* at 28. At the same time, however, Mokhtar's EEO complaint plainly refers to the module project in the same vein as her description of the "Not Successful" ratings, which the agency accepted as a discrete-act claim for age discrimination and reprisal, as well as part of a hostile work

the relief she was seeking, Mokhtar requested as a remedy "[a]n [e]xplanation for the reason my projects are being stopped after I put in a lot of time and effort[.]"  *Id.*  The Department argues that Mokhtar failed to exhaust a discrimination and retaliation claim as to this event.  For the reasons explained next, the Court disagrees.

The Department's exhaustion analysis, which is sparse in general, appears to be based on the fact that the agency's administrative acceptance-of-claims letters did not mention an intention to investigate the project cancellation, and as a result, the follow-up administrative investigation, as summarized through the Final Agency Decision, appears not to have looked into this issue.[7] *See, e.g.*, Def.'s Mem. Supp. Mot. Summ. J., ECF No. 87-2, at 9 ("Plaintiff failed to raise these claims during the administrative process, thereby depriving [the agency] of the opportunity to fully investigate the claims and provide an answer to them."); Def.'s Reply Supp. Mot. Summ. J., ECF No. 102, at 7 (asserting that the Department's Office of Civil Rights did not "consider[]" the module project claim).

In support of the Department's position, there are cases from this district holding that a plaintiff's "failure to respond to the [agency's] framing of the issue supports a finding that a plaintiff has failed to exhaust his administrative remedies with respect to those claims not

---

environment claim.  *See id.* at 2.  The Court finds this last fact to be the most persuasive and therefore concludes that the proper approach is to treat the project cancellation both as a discrete-act age discrimination and reprisal claim and as part of a hostile work environment claim, just as the agency did with the "Not Successful" ratings.

[7]     The Department notes that in her deposition, Mokhtar appears to concede that the only claims that survived the administrative process are those that were explicitly accepted for investigation by the agency.  *See* Def.'s Mem. Supp. Mot. Summ. J., ECF No. 87-2, at 9 (citing Mokhtar Depo., ECF No. 87-4, Ex. B at 19:14-20:3).  The Department, however, does not cite any authority providing that a plaintiff's (and especially a *pro se* plaintiff's) testimony about the scope of the administrative process controls a court's exhaustion analysis.  Instead, the Court will look to the administrative documents to determine which claims were exhausted.

approved by the EEO."[8]  *McKeithan v. Boarman*, 803 F. Supp. 2d 63, 68 (D.D.C. 2011) (internal

citations and quotation omitted), *aff'd in part*, No. 11-5247, 2012 WL 1450565 (D.C. Cir. Apr.

12, 2012), *aff'd sub nom.*, *McKeithan v. Vance-Cooks*, 498 F. App'x 47 (D.C. Cir. 2013); *see*

*also Cheatham v. Holder*, 935 F. Supp. 2d 225, 237 (D.D.C. 2013) (Title VII plaintiff failed to

exhaust two of four claims included in EEO charge when agency did not include those claims in

the issues it agreed to investigate and "[t]hroughout the investigation" the plaintiff "never

indicated that the investigation was narrower than his EEO complaint"); *Silver v. Leavitt*, No.

CIV.A. 05-0968, 2006 WL 626928, at *9 (D.D.C. Mar. 13, 2006) ("Although the administrative

record does contain some facts relating to plaintiff's claims of discrimination in connection with

the 2002 vacancy announcement and COTA agreement, those claims were not accepted for

investigation at the administrative level[,]" and plaintiff therefore "failed to exhaust her

administrative remedies with respect to all claims of discrimination that precede the 2003

vacancy announcement.").  This Court, however, is not convinced that such a hardline approach

is appropriate as a matter of law.

    In particular, an acceptance-of-claims letter, though organizationally useful in clarifying

the topics to be investigated, is not a mandated pre-investigation procedure under any statute or

regulation insofar as the agency is not required to identify for the complainant the specific claims

---

[8]    At least two other district courts have taken a similar approach.  *See Sellers v. U.S. Dep't of Defense*, No. C.A. 07-418S, 2009 WL 559795, at *11 (D.R.I. Mar. 4, 2009) (when plaintiff "was notified by the EEO that the issue being investigated was her termination and that if she disagreed with this formulation of the issue she should notify the EEO within seven days" but she "did not voice any disagreement with the issue as stated by the EEO," her "failure to respond to the framing of the issue support[ed] a finding that [she] did not exhaust her administrative remedies with respect to the hostile work environment claim"); *Clayton v. Rumsfeld*, No. CIV SA 02-CA-231, 2003 WL 25737889, at *3 (W.D. Tex. Aug. 8, 2003) (when plaintiff "raise[d] her demotion claim in her administrative charge" but "the issues accepted for investigation did not include" a demotion claim, plaintiff's "[f]ailure to object to the framing of the issue by the EEOC … constitute[d] an abandonment of the claim" when "Plaintiff was on notice of the omission").

that it will investigate following an EEO complaint and the complainant is not required to

respond within a certain time to avoid waiving those claims.[9]  But by putting the burden on the

complainant to object to the agency's acceptance-of-claims letter within the arbitrarily specified

timeframe, courts shift the exhaustion onus from the agency to the individual without any legal

basis for doing so.[10]  *See Ortiz-Diaz v. U.S. Dep't of Hous. & Urban Dev.*, 961 F. Supp. 2d 104,

111-12 (D.D.C. 2013) (holding that "agencies, not employees, have the burden of developing the

administrative record," and "[t]hat much [plaintiff] has done by having included racial

discrimination on his EEOC complaint").

     To be sure, in finding that a complainant "abandons" a claim by failing to respond to the

agency's acceptance-of-claims letter, some district courts have relied on the exhaustion

doctrine's requirement that the complainant must cooperate throughout the administrative

investigation or risk having the complaint dismissed.  *See Payne v. Locke*, 766 F. Supp. 2d 245,

249 (D.D.C. 2011) ("Exhaustion under Title VII demands a good faith effort by the employee to

cooperate with the agency and EEOC and to provide all relevant, available information."

(internal citation and quotation marks omitted)).  For example, in *Sellers v. U.S. Department of

Defense*, No. C.A. 07-418S, 2009 WL 559795 (D.R.I. Mar. 4, 2009), the court explained that the

_____

[9]     Importantly, the acceptance-of-claims letter here is fundamentally different than a
letter before or after the investigation that explicitly dismisses a part of the EEO complaint for
failure to state a claim.  *See* 29 C.F.R. § 1614.107(a)(1) (mandating agency dismissal for failure
to state a claim).  In the partial dismissal scenario, the agency has "identif[ied] [the claim] in the
charge, consider[ed] the elements of the claim, and determine[d] whether the charge has alleged
each of the elements."  *Dick v. Holder*, No. CV 13-1060 (RC), 2015 WL 691189, at *12 (D.D.C.
Feb. 19, 2015) (citation omitted).  By omitting a claim *sub silentio* from the EEO complaint in an
acceptance-of-claims letter, the agency does none of those things.  Another important distinction
is that a claimant may request that an administrative judge review a dismissal for failure to state
a claim, whereas no such right to judicial review exists for omitted claims.

[10]     The Department's acceptance-of-claims letter stated: "[I]t is essential for you to
notify this office in writing within 5 calendar days from receipt of this letter if you believe this
statement does not correctly identify the circumstance surrounding your complaint for
discrimination."  ROI Excerpts, ECF No. 87-3, Ex. A at 16-17.

plaintiff "was afforded an opportunity to submit a declaration to clarify her claims during the EEO investigation, but [the plaintiff] failed to provide a declaration despite the EEO's investigator's request." *Id*. at *11.  The court then held that because the plaintiff "had an obligation to respond to reasonable requests in the course of the agency's investigation of her discrimination and retaliation claims" but "did not fulfill that obligation,… she did not exhaust her administrative remedies[.]"  *Id*. (internal citations omitted).  Similarly, in *Green v. Small*, No. CIV.A. 05-1055, 2006 WL 148740 (D.D.C. Jan. 19, 2006), this district court explained that "when notified of the single alleged instance of retaliation it had accepted for investigation, plaintiff made no attempt to augment the 'accepted allegation' or amend his complaint prior to the conclusion of the investigation." *Id*. at *6.  Accordingly, the district court found that "[t]his is simply not a case where the plaintiff 'diligently pursued' the retaliation claims challenged by defendant," and the claims therefore were not exhausted. *Id*.

This Court, however, finds that failure to cooperate during the administrative investigation must be treated as factually and legally distinct from failure to respond to the acceptance-of-claims letter.  In particular, the acceptance-of-claims letter is more akin to an elective agency housekeeping procedure, not a legally mandated aspect of the administrative fact-finding investigative process.  As an example of the latter, 29 C.F.R. § 1614.107(a)(7) provides that when "the agency has provided the complainant with a written request to provide relevant information or otherwise proceed with the complaint, and the complainant has failed to respond to the request" in a timely manner, the agency "shall" dismiss the complaint.  *See also Wilson v. Peña*, 79 F.3d 154, 166 (D.C. Cir. 1996) ("Once a complainant files a complaint or appeal *and cooperates* with the agency or EEOC for 180 days, he is not required to take any further action to exhaust his administrative remedies." (emphasis added)).  But the acceptance-

of-claims letter is not a formal "written request" for information from the complainant during the investigation, but rather merely the voluntary provision of information *from the agency* to the complainant *before* the investigation begins; this is illustrated by the fact that the complainant need not respond to the acceptance-of-claims letter in order to trigger the follow-up investigation, as the original EEO complaint is sufficient to start that process.[11] *See, e.g.*, 29 C.F.R. § 1614.108(e) ("The agency shall complete its investigation within 180 days of the date of filing of an individual complaint…"); ROI Excerpts, ECF No. 87-3, Ex. A at 17 (stating in acceptance-of-claims letter that if Mokhtar does not timely respond, the agency *then* "will proceed with an investigation," and citing no requirement that Mokhtar must respond to the letter or the agency will not investigate).

Though addressing a different factual scenario, this Court's recent decision in *Dick v. Holder*, No. CV 13-1060 (RC), 2015 WL 691189 (D.D.C. Feb. 19, 2015), guides the analysis today and highlights why finding exhaustion of the project cancellation claim is appropriate.  In *Dick*, the plaintiff contended that "the package containing his formal EEO charge" included a copy of a letter that he had sent to an EEO counselor prior to filing the formal charge, and this letter allegedly contained certain Rehabilitation Act claims that the plaintiff argued should be incorporated into his formal charge, despite not being raised in the charge itself.  *Id*. at *6. Accepting as true that the letter was attached to the EEO charge, the Court nevertheless concluded that the plaintiff had failed to exhaust his Rehabilitation Act claims.  *See id*. at *8.  In

---

[11]    A closer look at the administrative process in this case reveals that Mokhtar did participate in the actual investigation.  Of note, Mokhtar submitted a lengthy "EEO Investigative Affidavit" on October 13, 2011, in which she elaborated on her discrimination, reprisal, and hostile work environment claims.  *See* ROI Excerpts, ECF No. 87-3, Ex. A at 23-33.  Mokhtar's affidavit also explicitly discussed the module project as part of her claim against the Department.  *See id*. at 28 ("[Dr. Bernhardt] would not allow me to complete my filmed project…"); *id*. (stating that she should have received a higher performance rating due to her work "writing and filming a consular module").

so holding, the Court explained that "[a]n agency may not *unreasonably omit claims from investigations*, in hopes that a complainant's tardy realization of the omission will constitute a failure to exhaust." *Id*. at *7 (emphasis added). By contrast, "where an agency *reasonably fails to identify for investigation* a claim *indirectly* asserted in a plaintiff's administrative charge, and where the plaintiff does not timely object to this omission before the agency, the plaintiff cannot show that he has exhausted administrative remedies as to this claim." *Id*. at *8 (emphasis added). After finding that the plaintiff's "formal EEO charge neither explicitly incorporated the letter nor,… made any mention of discrete-act or hostile work environment Rehabilitation Act claims," the Court concluded that the agency's omission of the claims from its investigation was not unreasonable, and the plaintiff therefore had failed to exhaust those claims. *Id*. at *7-8.

The instant case presents the opposite scenario from *Dick*. Here, Mokhtar's claim as to the cancellation of the module project was written plainly and directly on the face of the formal EEO complaint, and the agency has offered no justification for why it omitted this claim from the set of issues it agreed to investigate but included the "Not Successful" ratings claim, which was written just as plainly in the same narrative space on the complaint form right below the checked "age" and "reprisal" discrimination boxes. *See* ROI Excerpts, ECF No. 87-3, Ex. A at 2. Thus, without any reasonable explanation from the agency for its omission and applying the *Dick* analysis, Mokhtar's situation falls into the category in which "[a]n agency may not unreasonably omit claims from investigations, in hopes that a complainant's tardy realization of the omission will constitute a failure to exhaust," *Dick*, 2015 WL 691189, at *7, and not the category in which the "agency reasonably fails to identify for investigation a claim indirectly asserted in a plaintiff's administrative charge." *Id*. at *8. As such, the Court finds that Mokhtar exhausted this claim.

Finally, the Court emphasizes that today's holding is consistent with the policies underlying the exhaustion doctrine.  Specifically, allowing a party to bring to court only those claims that are "like or reasonably related to the allegations of the charge and growing out of such allegations," *Park*, 71 F.3d at 907, balances two competing concerns:

> On the one hand, "[t]he purpose of the [exhaustion] doctrine is to afford the agency an opportunity to resolve the matter internally and to avoid unnecessarily burdening the courts."  *Wilson v. Peña*, 79 F.3d 154, 165 (D.C. Cir. 1996); *see also Brown v. Marsh*, 777 F.2d 8, 15 (D.C. Cir. 1985) (describing "exhaustion doctrine's purpose" as "giving the agency notice of a claim and opportunity to handle it internally").  On the other hand, because courts must ensure that remedies provided by federal employment discrimination law are "accessible to individuals untrained in negotiating procedural labyrinths…[,] the strictures of common law pleading have no place in a scheme largely dependent upon self-service in drawing up administrative charges."  *Brown*, 777 F.2d at 14 (internal quotation marks and citations omitted).

*Dick*, 2015 WL 691189, at *5 (alterations in *Dick*).  Thus, in *Dick*, the Court was influenced in part by the fact that the plaintiff's failure to contest a reasonably omitted claim denied the agency "'notice of [the] claim and [an] opportunity to handle it internally'" through no fault of the agency itself.  *Id.* at *12 (quoting *Brown*, 777 F.2d at 15); *see also id.* (explaining that the "reasonable omission of a claim without objection … is an indication that the agency neither has considered nor will consider the omitted claim").

The lack of investigation is less concerning, however, when the agency acted unreasonably by omitting the claim in the first place, which is the critical distinction between the *Dick* scenario and Mokhtar's situation.  In other words, "viewed through the policies animating the exhaustion doctrine," *id.*, Mokhtar *did* give the agency "notice of [her] claim and [an] opportunity to handle it internally," *Brown*, 777 F.2d at 15, but the agency failed to fulfill its part of the bargain by unreasonably omitting the claim from its investigation after receiving notice through the EEO charge.  And at the same time, permitting an agency to unreasonably omit a claim in an acceptance-of-claims letter, and then also to shift the burden onto the complainant to

object, would erect an unnecessary and confusing procedural hurdle that frustrates this Court's duty to ensure that the protections afforded by federal employment discrimination laws are "kept accessible to individuals untrained in negotiating procedural labyrinths." *Id.* at 14 (internal citations and quotation marks omitted).

Thus, to summarize, the Court reaches two conclusions today. First, Mokhtar's failure to respond to the acceptance-of-claims letter was not a failure to "cooperate" with the agency's investigation within the proper meaning of the cooperation requirement. And second, Mokhtar, by explicitly and directly raising this discrete event in her formal EEO complaint — and regardless of her failure to respond to the agency's acceptance-of-claims letter — exhausted her age discrimination and reprisal claims as to the cancellation of the project because the agency, which bears the burden of establishing exhaustion under both Title VII and the ADEA, has failed to establish that it acted reasonably in omitting this claim from its follow-up investigation.[12]

## 2. Other Allegations In The Complaint

Besides the cancellation of the module project, however, the Court agrees with the Department that Mokhtar failed to raise the other discrete-act allegations in her civil complaint, described above, in her EEO complaint, nor are such claims "like or reasonably related to the allegations of the charge and growing out of such allegations." *Park*, 71 F.3d at 907 (citation omitted). The Court therefore grants summary judgment in favor of the Department on the basis that Mokhtar failed to exhaust these separate claims before filing suit. Consequently, the Court finds that Mokhtar only exhausted claims for (1) discrete-act age discrimination and reprisal

---

[12]     By finding that the agency was "unreasonable" in omitting the claim, the Court does not mean to imply that the agency acted intentionally to thwart Mokhtar's efforts to seek redress; rather, the Court simply notes that unlike in *Dick* — where the agency reasonably overlooked a letter that was included in the same package as the EEO complaint but that was not mentioned in, nor incorporated by reference into, the complaint — the agency here presents no such attenuating circumstances that might justify its omission.

based on the 2010 performance ratings; (2) an allegedly hostile work environment characterized

by "false accusations"; (3) discrete-act age discrimination and reprisal based on not receiving a

performance award; and (4) discrete-act age discrimination and reprisal based on the cancellation

of the module project.[13]

### 3.  Failure To Seek Timely EEO Counseling

Alternatively, the Department also asserts an exhaustion defense based on Mokhtar's

failure to seek EEO counseling in a timely manner in regard to her allegations that Dr. Bernhardt

did not select her for two supervisory positions in 2007 and 2008, and that Dr. Bernhardt

prevented her from volunteering for two other positions in 2007 and 2008.  Under Title VII and

the ADEA, aggrieved individuals must "initiate contact with a Counselor within 45 days of the

date of the matter alleged to be discriminatory." 29 C.F.R. § 1614.105(a)(1).  An employee

satisfies the timeliness requirement if she (1) contacts "an agency official logically connected

with the EEO process, even if that official is not an EEO counselor," and (2) "exhibit[s] an intent

to begin the EEO process." *Miller v. Hersman*, 594 F.3d 8, 11 n.1 (D.C. Cir. 2010) (citation and

quotation omitted; alteration in original).  The Court agrees that Mokhtar failed to seek EEO

counseling in a timely manner for the non-selection and volunteer position claims.

As to the non-selection claims, Mokhtar's complaint does not specify what those

positions were or when Dr. Bernhardt's alleged interference occurred.  *See* Compl., ECF No. 1 at

6.  In her deposition, however, Mokhtar testified that she applied for two positions sometime in

2007 and 2008, and that she has not applied for any other positions since then.  *See* Mokhtar

---

[13]      The Court notes that although the non-exhausted allegations are not considered
discrete claims, some of the allegations still bear on the discrete claims that Mokhtar did exhaust
(*e.g.*, Mokhtar's allegations that she was forced to sign a document saying she would get
recertified or that CTT employees were persuaded to prevent her from getting recertified are
relevant to her discrete "Not Successful" performance ratings claim).

Depo., ECF No. 87-4, Ex. B. at 190:3-20.  Because Mokhtar did not make contact with an EEO

counselor until January 13, 2011, at the earliest, *see* ROI Excerpts, ECF No. 87-3, Ex. A at 5, the

Court grants summary judgment for the Department on the basis that Mokhtar failed to seek

timely counseling for the non-selection claims.  *See Foster v. Gonzales*, 516 F. Supp. 2d 17, 28

(D.D.C. 2007) (granting summary judgment for agency when plaintiff "failed to exhaust his

administrative remedies under Title VII" by not "initiat[ing] contact with an EEO counselor

within 45 days of the effective date of his termination").

For the same reason, the Court also grants summary judgment for the Department as to

Mokhtar's allegations that she was not permitted to take volunteer positions in a passport office

in 2007 and in Iraq in 2008.  *See* Compl., ECF No. 1 at 5; Mokhtar Depo., ECF No. 100-1, Ex. 3

at 170:1-8 (discussing 2008 volunteer position in Iraq).  By not seeking EEO counseling until

January 13, 2011, Mokhtar failed to meet the 45-day statutory deadline.

### B.  Title VII And ADEA Age Discrimination And Reprisal

The Court next turns to the merits of the following claims that remain at issue in this

litigation: (1) age discrimination under the ADEA as to the performance ratings, the lack of

awards, and the cancellation of the module project; and (2) reprisal under Title VII and the

ADEA as to the performance ratings, the lack of awards, and the cancellation of the module

project.[14]  The Department moves for summary judgment on each of these claims.  Because the

Court's analytical framework varies based on the type of arguments raised by the Department,

the Court begins by addressing the performance ratings and lack of awards claims, before then

addressing the project cancellation claims in Part IV.B.2-3., *infra*.

---

[14]      Mokhtar's hostile work environment claim is addressed in Part IV.C., *infra*.

1.  Age Discrimination And Retaliation: Performance Ratings And Lack Of Awards

Traditionally, Mokhtar's Title VII and ADEA claims, whether for discrimination or retaliation, would be analyzed using the three-step framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See also Chappell-Johnson v. Powell*, 440 F.3d 484, 487 (D.C. Cir. 2006) ("The *McDonnell Douglas* framework applies to both Title VII and ADEA claims.").  Under this framework, a plaintiff first must establish a prima facie case of discrimination or retaliation; the burden then shifts to the employer to articulate a legitimate, nondiscriminatory and/or non-retaliatory reason for the adverse employment action; and if the employer meets its burden, the burden shifts back to the plaintiff to demonstrate that the offered non-discriminatory reason was, in fact, pretext for a prohibited reason.  *See McDonnell Douglas*, 411 U.S. at 802-04.

The D.C. Circuit has recognized, however, that when an employer moves for summary judgment in a lawsuit such as this one, "the employer ordinarily will have asserted a legitimate, non-discriminatory reason for the challenged decision."[15]  *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008).  When that is the case, "the question whether the employee actually made out a prima facie case [at the first stage of the *McDonnell Douglas* framework] is no longer relevant and thus disappears and drops out of the picture."  *Id*. (internal quotation marks and alterations omitted).  Consequently, "in a … disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not — *and should not* —

---

[15]   *Brady* does not expressly address age discrimination claims, but courts in this Circuit regularly have extended *Brady*'s methodology to claims under the ADEA. *See, e.g.*, *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008); *Lurie v. Mid-Atl. Permanente Med. Grp., P.C.*, 729 F. Supp. 2d 304, 316-17 (D.D.C. 2010); *Chappell-Johnson v. Bair*, 574 F. Supp. 2d 87, 96 n.9 (D.D.C. 2008), *aff'd*, 358 F.App'x. 200 (D.C. Cir. 2009).

decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Id.* at 494 (emphasis in original).  Instead, in resolving the employer's motion, "the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on [a prohibited basis]"?  *Id.*

The Department moves for summary judgment as to Mokhtar's age discrimination and reprisal claims under Title VII and the ADEA on the basis that the agency had legitimate, non-discriminatory reasons for the 2010 "Not Successful" ratings and for the decision not to nominate Mokhtar for an award based on her work during the 2010 ratings year.  *See* Def.'s Mem. Supp. Mot. Summ. J., ECF No. 87-2, at 18.  The Department does not challenge whether either of these events qualifies as an adverse employment action, but rather offers non-discriminatory reasons and then jumps into *Brady*'s "one central question" analysis.  *See, e.g., id.* at 19; *see also Martin v. District of Columbia*, No. CV 11-01069 (RC), 2015 WL 294723, at *23 n.43 (D.D.C. Jan. 23, 2015) ("*Brady* authorizes courts to ask the 'one central question' only 'where an employee *has suffered an adverse employment action* and an employer has asserted a legitimate, non-discriminatory reason for the decision[.]'" (quoting *Brady*, 520 F.3d at 494; emphasis in *Martin*).  The Court therefore does the same.

a. *The Department Offers Legitimate, Non-Discriminatory Reasons For Its Actions*

Once an adverse employment action has occurred, *Brady* next requires a district court to ask whether "an employer has asserted a legitimate, non-discriminatory reason for the [adverse employment] decision."  *Brady*, 520 F.3d at 494.  Here, the Court finds that the Department

27

offers evidence of legitimate, non-discriminatory reasons for both the "Not Successful" performance ratings and the decision not to nominate Mokhtar for a performance award.

As to the "Not Successful" ratings, the Department offers, through Dr. Elrayah's evaluation, several non-discriminatory reasons for the ratings, including: "Mokhtar did not keep good track of her consultees … and poorly communicated with her supervisor in this matter"; there "were concern[s] about the interpersonal skills and communication level of [Mokhtar] during this rating year[, and] [s]he missed some consultation sessions with her students without rescheduling or talking with the students"; and Mokhtar "did not keep complete records of her consultees, and did not respond in [a] timely manner to her supervisor's requests to provide [a] complete consultation report that reflects scheduled, conducted, and missed [Learning Consultation] sessions."  ROI Excerpts, ECF No. 87-3, Ex. A at 115.

In addition, the Department provides evidence that Mokhtar's "Not Successful" ratings were based on her failure to complete the required examiner recertification by the end of the 2010 ratings year.  *See id*. at 75, 115.  In particular, Mokhtar signed a mid-year performance review form agreeing to obtain both the testing and examiner recertifications before the end of the year, *see id*. at 60-61, 118; Mokhtar Depo., ECF No. 87-4, Ex. B at 117:23-118:9, and although she completed the testing recertification in time, it is undisputed that she did not complete the examiner recertification by the end of December 2010.  *See* ROI Excerpts, ECF No. 87-3, Ex. A at 60, 115; Mokhtar Depo., ECF No. 87-4, Ex. B at 119:21-120:5; *see also* Hoffman Depo., ECF No. 100-1, Ex. 7 at 35:1-6 (testifying that Mokhtar did not complete her examiner recertification because she could not meet the Department's standards).  Indeed, Mokhtar, during her deposition, acknowledged that she was expected to perform testing and examining as part of her job duties, and that she was ordered to complete both recertifications but failed to do so.  *See*

Mokhtar Depo., ECF No. 87-4, Ex. B at 119:21-120:5, 148:16-22; Mokhtar Depo., ECF No. 100-1, Ex. 3 at 149:1-18.  Mokhtar's failure to complete the required examiner recertification by the deadline constitutes another legitimate, non-discriminatory reason for her "Not Successful" performance ratings.

Regarding the decision not to nominate Mokhtar for a performance award, the evidence shows that it is the FSI's policy that awards are intended "to provide appropriate incentives and recognition for employees to encourage and reward outstanding performance," and "it is essential that monetary awards be given only to those employees who are exceptionally deserving."  ROI Excerpts, ECF No. 87-3, Ex. A at 94.  The Department then offers evidence that the decision not to nominate Mokhtar for an award was based on the "Not Successful" ratings in her 2010 performance review, which is a legitimate, non-discriminatory reason for the employer's decision.  *See id*. at 66, 104, 106.

   b.  *Plaintiff Fails To Show That The Department's Non-Discriminatory Reasons Are A Pretext*

With the Department having met its burden, the Court next asks: "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on [a prohibited basis]"?  *Brady*, 520 F.3d at 494.  Evidence of pretext might include variant treatment of similarly situated employees, discriminatory statements by decision makers, and irregularities in the offered reasons for the adverse employment decision. *See id.* at 495 & n.3; *Bennett v. Solis*, 729 F. Supp. 2d 54, 60 (D.D.C. 2010).  Here, Mokhtar fails to offer evidence creating a genuine dispute of material fact as to any circumstance that might even hint at pretext; instead, she almost exclusively relies on self-serving and conclusory

testimony and her own opinions about what her employer should have done, none of which is

sufficient to withstand the Department's evidence at summary judgment.

Starting with the performance ratings, to rebut the Department's evidence, Mokhtar relies

on her opinion that she should not have been rated as "Not Successful" because, for example, she

was sufficiently "knowledgeable" to perform her job without recertification based on her

experience and the parts of the retraining she completed, the retraining involved skills that were

not necessary for her position, the recertifications were a waste of the Department's resources,

and her supervisors should have ignored errors she made during the retraining because they were

not important.  *See* Pl.'s Mem. Opp'n Mot. Summ. J., EFC No. 100, at 20-21; *see also, e.g.*,

Mokhtar Depo., ECF No. 87-4, Ex. B at 142:4-8 (opining that there was "no need" for retraining

because "it had a lot of basic … information about testing that I already knew … and it's just a

waste of resources and time"); *id*. at 146:8-9 (opining that "all of this is illegal because testing is

not mandatory"); *id*. at 148:19-22 ("They should have just been more tolerable of small errors

that were not fatal [during the retraining] and just eased me in back to the system instead of

making a big deal out of every little thing."); Mokhtar Aff., ECF No. 100-1, Ex. 4 at ¶ 3 ("I did

not think [getting recertified as an examiner] was necessary…").

The Court, however, "cannot credit [Mokhtar's] subjective assessment of [her] own

qualifications," *McNally v. Norton*, 498 F. Supp. 2d 167, 183 (D.D.C. 2007), because a

"plaintiff's perception of [herself], and of [her] work performance, is not relevant" at this stage

of the *Brady* analysis.  *Waterhouse v. District of Columbia*, 124 F. Supp. 2d 1, 7 (D.D.C. 2000).

Instead, "[i]t is the perception of the decision-maker that is relevant to determining pretext, not a

plaintiff's perception of [her]self."  *McNally*, 498 F. Supp. 2d at 183 (citation omitted); *see also*

*Harris v. Univ. of the District of Columbia*, No. 87-2631, 1990 WL 99316, at *5 (D.D.C. July 6,

1990) ("[P]laintiff's subjective belief of qualifications is not evidence that can be used to establish that [s]he was qualified for the job." (citations omitted)).

Accordingly, when determining whether proffered reasons are a pretext, the Court "does not examine whether the reasons the [Department] offered were correct but instead focuses on whether the [relevant] officials at the [Department] honestly believed the reasons they offered." *McNally*, 498 F. Supp. 2d at 183.  Mokhtar, however, offers no evidence creating a genuine dispute about whether the relevant Department officials actually and honestly believed the reasons they provided for the performance ratings or their reasons for why she was required to complete the recertifications in the first place.  Mokhtar's opinions that recertification was not important, that certain skills should not have been required for her position, or that certain errors were minor are insufficient to meet her burden.[16]  *See, e.g.*, Mokhtar Depo., ECF No. 100-1, Ex. 3 at 89:1-5 (opining that testing errors were "small things").

Mokhtar also argues that the Department engaged in a conspiracy to prevent her from becoming recertified as an examiner.  *See* Pl.'s Mem. Opp'n Mot. Summ. J., ECF No. 100, at 21. None of the evidence she cites, however, supports her position that the Department deliberately interfered with her completion of the recertification process; instead, Mokhtar is left to rely on her own unsubstantiated and conclusory statements to support this position, which is insufficient to create a genuine dispute of fact at summary judgment.  Specifically, Mokhtar cites two

---

[16]    *Wilson v. LaHood*, 815 F. Supp. 2d 333 (D.D.C. 2011), is instructive.  There, the plaintiff "attempt[ed] to show pretext by making conclusory allegations that he was in fact qualified for promotion … and that he was entitled to a promotion because he had successfully worked for more than one year at a [lower] level."  *Id*. at 340.  Based on these allegations, the Court granted summary judgment for the defendant-employer because the plaintiff had "not presented any evidence that he was discriminated against based on age or race," or that tended to show "that the proffered reason for failing to promote him — his failure to qualify for the [new] position — is a mere pretext for discrimination."  *Id*. at 340-41.  Likewise here, Mokhtar offers no evidence creating a genuine dispute as to the legitimacy of the Department's reasons for her performance ratings.

deposition transcripts, but neither is probative of any plot by the Department to obstruct her.  For

example, Christina Hoffman stated during her deposition that Department examiners not in good

standing were limited to walk-in candidates for their observations, which suggests nothing about

discrimination or obstruction towards Mokhtar.  *See* Hoffman Depo., ECF No. 100-1, Ex. 7 at

14:7-9.  Similarly, Mokhtar cites a portion of David Red's deposition in which he testifies to not

remembering whether the Department had a policy regarding walk-ins, which also does not

support Mokhtar's conspiracy theory.  *See* Red Depo., ECF No. 100-1, Ex. 9 at 16:6-20.  Instead,

Mokhtar relies on her own conclusory testimony to allege that she was permitted to use only

walk-ins for her observations because of a purported scheme to delay her recertification, while

younger employees were allowed to observe non-walk-ins, which enabled those employees to

perform observations more frequently than Mokhtar.  *See* Mokhtar Stmt. Facts in Dispute, ECF

No. 100, at ¶ 14 (citing Mokhtar Depo., ECF No. 100-1, Ex. 3 at 127:2-11).

Thus, absent her own conclusory testimony, the evidence Mokhtar cites does not support

her argument about a plan within the Department to prevent her from finishing the recertification

process.  But such conclusory, self-serving statements by a plaintiff do not create a genuine

dispute of material fact for purposes of summary judgment.  *See, e.g.*, *Lindsey v. Rice*, 524 F.

Supp. 2d 55, 60 (D.D.C. 2007) (granting summary judgment when plaintiff's "self-serving

statements [were] too conclusory to survive [defendant's] summary judgment motion").  This is

especially true when these statements are unsubstantiated by any non-self-serving evidence and,

in fact, are rendered unreasonable given other undisputed evidence in the record — which is

exactly the case here because undisputed evidence shows that the Department, rather than

attempting to thwart Mokhtar, gave her more than two years to complete the process and actually

went out of its way to accommodate her demand for special individualized recertification courses

so that she would not have to take the same courses as new hires.  *See* ROI Excerpts, ECF No. 87-3, Ex. A at 77-80, 87; Mokhtar Depo., ECF No. 87-4, Ex. B at 142:9-16; Hoffman Depo., ECF No. 87-6, Ex. 4 at 21:11-17 (alleged instruction to prevent Mokhtar from completing recertifications "would never, ever happen"); *see also Anderson*, 477 U.S. at 252 (a genuine dispute of material fact requires "evidence on which the jury could *reasonably* find for [the nonmoving party]" (emphasis added)); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993) ("[A] mere unsubstantiated allegation … creates no 'genuine issue of fact' and will not withstand summary judgment."); *Hastie v. Henderson*, 121 F. Supp. 2d 72, 81 (D.D.C. 2000) (finding no genuine issue of material fact when plaintiff "has provided no information … other than her own self-serving and conclusory statement" to show that employer's offered reason was "pretextual"). And, at the same time, Mokhtar admits that she was given four separate observation periods to complete the examiner recertification — which contradicts her claim that she was prevented from finishing the process — but she continued to make errors during these observations that prevented her from being recertified.  *See* Mokhtar Depo., ECF No. 100-1, Ex. 3 at 88:21-89:10 (admitting errors during four observation periods but opining that errors were "lame excuses" and "small things").

Similarly, Mokhtar testified that a number of younger employees were able to complete certain observation testing faster by using non-walk-ins.  *See id.* at 122:20-25, 127:2-11.  But the examples Mokhtar provided are not analogous to her situation for two reasons: first, Mokhtar offered examples of the timing and age for people who were receiving their original examiner certification, not the later recertification at issue here, *see id.* at 125:16-25; and second, Mokhtar demanded an individualized recertification plan rather than following the interactive training program used by other employees seeking recertification, thus placing her in a unique situation

and making any comparison between her and those employees on the standard recertification path unhelpful.  *See id*. at 142:1-16.  Indeed, the evidence shows that Mokhtar received her individual recertification plan in March 2008 but did not respond for more than two years, which demonstrates that the lengthy delay was due to her decision to ignore the plan and the recertification requirements, *see* ROI Excerpts, ECF No. 87-3, Ex. A at 77, 88, and then once she did engage in the process, she still failed to meet the Department's standards.  *See, e.g.*, Hoffman Depo., ECF No. 100-1, Ex. 7 at 35:1-6 (in "the function of the examiner … you are supposed to follow very strict standards.  That's where [Mokhtar] didn't seem to be able to be recertified…").

Similar flaws befall Mokhtar's attempted opposition to the Department's evidence that the "Not Successful" performance ratings were based, at least in part, on her failure to attend meetings with students and failure to provide a report that her supervisor requested.  As to the missed meetings, Mokhtar admits that she missed appointments with students, *see* Mokhtar Depo., ECF No. 100-1, Ex. 3 at 160:21-161:4; Mokhtar Aff., ECF No. 100-1, Ex. 4 at ¶ 5 ("I missed only two appointments with students in 2010."), and she fails to offer any evidence that the Department officials did not honestly believe that the missed meetings were a basis for her performance ratings.  *See McNally*, 498 F. Supp. 2d at 183.  Rather, Mokhtar simply argues that the missed meetings were not her fault and that they should not have been given such importance by the Department in preparing her ratings, *see, e.g.*, Mokhtar Depo., ECF No. 100-1, Ex. 3 at 160:21-161:4; Mokhtar Aff., ECF No. 100-1, Ex. 4 at ¶ 5; such arguments are, of course, insufficient to establish pretext.  *See Waterhouse*, 124 F. Supp. 2d at 7-8 (plaintiff's "opinion" that "she was competent and performed well in her position, that her performance problems were not as serious as described by defendants, [or] that they were outweighed by her successes … is simply not relevant nor sufficient to raise an inference of pretext").

Likewise, Mokhtar concedes that she failed to provide the report for which Dr. Elrayah asked regarding her meetings with students and instead argues that the report was not necessary and her error was "*de minimis*" because she had provided the information through regular individual reports. *See* Pl.'s Stmt. Facts in Dispute, ECF No. 100, at ¶ 20; Mokhtar Depo., ECF No. 100-1, Ex. 3. at 161:19-162:14; *see also* Pl.'s Mem. Opp'n Mot. Summ. J., ECF No. 100, at 23. But, again, Mokhtar's opinion about what reports her superior should have required is irrelevant and does not show that the Department's offered non-discriminatory reason is a pretext. And in addition, the individual reports that Mokhtar had been providing to Dr. Elrayah did not contain all the information for which he asked, including when Mokhtar had missed meetings with students, nor did Mokhtar's reports contain the aggregate information about the number of scheduled, conducted, and missed meetings that Dr. Elrayah requested. *See* ROI Excerpts, ECF No. 87-3, Ex. A at 91; Learning Consultation Activities Worksheets, ECF No. 100-1, Ex. 15.

Finally, Mokhtar argues that she received awards in the past and "expected" to receive an award for her work during the 2010 ratings year. *See* Pl.'s Mem. Opp'n Mot. Summ. J., ECF No. 100, at 23; Mokhtar Aff., ECF No. 100-1, Ex. 4 at ¶ 8. Mokhtar, however, makes no argument and offers no evidence suggesting that the Department's offered non-discriminatory reason for her lack of an award for the 2010 ratings year — her "Not Successful" performance ratings — was a pretext; her subjective opinion and self-serving statements about whether she deserved in award are insufficient to create a genuine dispute of fact. *See McNally*, 498 F. Supp. 2d at 183; *see also Saunders v. DiMario*, No. Civ. A. 97-1002, 1998 WL 525798, *4 (D.D.C. Aug. 14, 1998) ("Plaintiff has otherwise offered the type of self-serving allegations that are simply insufficient to establish pretext."). Indeed, Mokhtar has acknowledged that employees

who do not achieve "Successful" ratings do not receive performance awards.  *See* Mokhtar

Depo., ECF No. 87-4, Ex. B at 184:16-23.  Mokhtar therefore fails to meet her burden.

*      *      *

In sum, the Department provides legitimate, non-discriminatory reasons for Mokhtar's

2010 "Not Successful" performance ratings and the decision not to nominate her for a

performance award.  Mokhtar, however, fails to meet her burden of showing that the

Department's offered reasons are a pretext.  Accordingly, the Court grants summary judgment in

favor of the Department on Mokhtar's ADEA discrimination claim and Title VII and ADEA

reprisal claims as to the 2010 performance ratings and the lack of awards.

### 2.  Age Discrimination: Cancellation Of The Module Project

The Court has rejected the Department's argument that Mokhtar failed to

administratively exhaust her age discrimination and reprisal claims as to the cancellation of the

module project.  *See* Part IV.A.1., *supra*.  But in its motion for summary judgment, the

Department also attacks the merits of such claims by making two arguments: first, Mokhtar fails

to satisfy the adverse employment action element required for a prima facie ADEA age

discrimination claim; and second, the reprisal claim fails because Mokhtar cannot demonstrate a

causal connection between her protected activity, a 1998 EEO complaint, and the Department's

alleged adverse action in cancelling the project.  *See* Def.'s Mem. Supp. Mot. Summ. J., ECF

No. 87-2, at 14-15, 17.

As noted above, *Brady* requires a court to skip the prima facie case analysis and ask the

"one central question" only when the employee has suffered an adverse employment action *and*

the employer has offered a non-discriminatory reason for the decision.  *See Brady*, 520 F.3d at

494.  Because the Department's motion for summary judgment offers no explicit non-

36

discriminatory reason for the decision to cancel the module project, *Brady* does not apply, and the Court must return to the world of *McDonnell Douglas*, under which Mokhtar has the initial burden of establishing a prima facie case of discrimination and retaliation.[17]  *See McDonnell Douglas*, 411 U.S. at 802; *see also Brady*, 520 F.3d at 494 n.2 ("For those rare situations where it still matters whether the employee made out a prima facie case — namely, those cases in which the defendant does not assert *any* legitimate, nondiscriminatory reason for the decision…" (emphasis in original)).

Thus, starting with the ADEA age discrimination claim, a plaintiff's prima facie case requires evidence that (1) she is a member of the protected class (*i.e.*, over 40 years of age); (2) she was qualified for the position and was performing her job well enough to meet her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was disadvantaged in favor of a similarly situated younger person.  *See Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1155 (D.C. Cir. 2004); *Williams v. Stake*, No. 14-1210, 2014 WL 6765442, at *4 (D.D.C. Dec. 2, 2014).  The Department seeks summary judgment as to the third element, namely that the cancellation of the module project was not an adverse employment

---

[17]     More specifically, the Department does not assert a non-discriminatory reason argument for cancelling the project in its motion for summary judgment, but it does offer such analysis in its reply brief.  *See* Def.'s Reply Supp. Mot. Summ. J., ECF No. 102, at 16-17.  The Court, however, will ignore the Department's argument because it was not raised in the original brief and a movant cannot use its reply brief to expand the scope of a summary judgment motion.  *See McBride v. Merrell Dow & Pharm.*, 800 F.2d 1208, 1211 (D.C. Cir. 1986) ("Considering an argument advanced for the first time in a reply brief … is not only unfair to [a plaintiff], but also entails the risk of an improvident or ill-advised opinion on the legal issues tendered." (citation omitted)); *Conservation Force v. Salazar*, 916 F. Supp. 2d 15, 22 (D.D.C. 2013) (party forfeits argument made for the first time in its reply brief); *Baloch v. Norton*, 517 F. Supp. 2d 345, 348 n.2 (D.D.C. 2007) ("If the movant raises arguments for the first time in his reply to the non-movant's opposition, the court will either ignore those arguments in resolving the motion or provide the non-movant an opportunity to respond to those arguments by granting leave to file a sur-reply.").

action within the meaning of the statute.[18]  *See* Def.'s Mem. Supp. Mot. Summ. J., ECF No. 87-2, at 14-15.

The D.C. Circuit has defined an adverse employment action for purposes of a discrimination claim as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits."  *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (citation omitted).  If, however, an employment action is not presumptively adverse, such as a hiring or firing, the "employee must experience materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm."  *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009) (citation, quotation, and alteration omitted).  "Not everything that makes an employee unhappy is an actionable adverse action," *Broderick v. Donaldson*, 437 F.3d 1226, 1233 (D.C. Cir. 2006) (citation, quotation, and alteration omitted), and "purely subjective injuries, such as dissatisfaction with a reassignment, public humiliation, or loss of reputation, are not adverse actions."  *Holcomb*, 433 F.3d at 902 (citation and quotation marks omitted).

In opposition to the Department's motion, Mokhtar argues that through the development of the consular module, she "effectively act[ed] in a supervisory role over several other employees" such that cancellation of the project was "effectively" a demotion to a "non-supervisory role" and a loss of responsibilities.  *See* Pl.'s Mem. Opp'n Mot. Summ. J., ECF No. 100, at 18-19.  The D.C. Circuit has explained, however, that "changes in assignments or work-

---

[18]      In its motion for summary judgment, the Department asserts generalized arguments regarding the "qualified for the position" element and the "disadvantaged in favor of a younger person" element, but the Department's analyses do not focus on the module project in particular.  The Court therefore only discusses the Department's more developed argument as to the "adverse employment action" element.

related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour changes." *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1557 (D.C. Cir. 1997). Though Mokhtar provides some uncorroborated evidence suggesting that she spent extra time working on this project under her own volition, *see, e.g.*, Mokhtar Depo., ECF No. 100-1, Ex. 3 at 28:1-4, 185:8-9, it undisputed that her salary, title, position description, and official duties as a Language and Culture Instructor remained unchanged following the cancellation of the project.

Indeed, preparing the module was never part of Mokhtar's official duties as a Language and Culture Instructor, *see* ROI Excerpts, ECF No. 87-3, Ex. A at 123-24, and in fact, she chose to start the project on her own without orders to do so from any supervisor. *See* Mokhtar Depo., ECF No. 100-1, Ex. 3 at 28:1-3 ("I wasn't given a task. I was just there in the section. So I decided to do [the module project]."); Mokhtar Aff., ECF No. 100-1, Ex. 4 at ¶ 9 ("In 2010, on my own initiative, I began developing a consular training module…"). It therefore does not reasonably follow that cancellation of this voluntary, unofficial project would constitute a material change of assignments or responsibilities that might cause an "objectively tangible harm" to her employment condition. *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002); *Holcomb*, 433 F.3d at 902 (explaining that "dissatisfaction with a reassignment" is a "purely subjective injur[y]" not protected by statute unless and until it results in an "objectively tangible harm" to the employee (citation and quotation omitted)).

The same holds true for Mokhtar's assertion that she was "effectively" demoted from a supervisory role to a non-supervisory role through the project cancellation: her official position and responsibilities did not change in the slightest because her position never included supervisory duties to begin with, and there is no evidence that the cancellation of the project was

of such a nature that it altered the objective terms of her employment or limited her future career

opportunities, such as future promotions or pay increases. *Cf. Cones v. Shalala*, 199 F.3d 512,

521 (D.C. Cir. 2000) (finding adverse employment action when employer's refusal to allow

plaintiff "to compete for the promotion was tantamount to refusing to promote him"). In fact, the

evidence suggests only that Mokhtar coordinated the work of others on the project, not that she

"supervised" them in any meaningful sense. *See* Mokhtar Aff., ECF No. 100-1, Ex. 4 at ¶ 9 ("I

worked on [the project] with many of my coworkers. At one point I was coordinating as many

as nine or ten people in its development."); *cf. Vance v. Ball State Univ.*, --- U.S. ---, 133 S. Ct.

2434, 2439 (2013) (holding that "an employee is a 'supervisor' for purposes of vicarious liability

under Title VII if he or she is empowered by the employer to take tangible employment actions

against the victim").

Further, Mokhtar mistakenly relies on *Youssef v. FBI*, 687 F.3d 397 (D.C. Cir. 2012), in

an attempt to establish that the project cancellation constituted an adverse employment action

even without any change in salary or benefits. *See* Pl.'s Mem. Opp'n Mot. Summ. J., ECF No.

100, at 18. In *Youssef*, the D.C. Circuit found an adverse employment action under Title VII

based on the FBI's reassignment of the plaintiff, a FBI counterterrorism investigator, to a new

department within the agency that "did not utilize his skills and expertise," that resulted in him

performing menial tasks below those which he had been performing and alongside co-workers

who were several pay-grades below him, and that, unlike his prior positions, involved no

supervisory responsibilities. *Id*. at 401-02 (alterations omitted).

Here, by contrast, the Department did not "reassign" or "demote" Mokhtar by any

definition of the words, nor did it reduce any of her official responsibilities as a Language and

Culture Instructor, which never included preparing language modules or supervising employees.

Instead, the Department merely cancelled one short-term project that Mokhtar had "begun developing" under "her own initiative," with no tangible harm to Mokhtar's employment condition.  *See* Pl.'s Mem. Opp'n Mot. Summ. J., ECF No. 100, at 14; Mokhtar Aff., ECF No. 100-1, Ex. 4 at ¶ 9.  This is in stark contrast to the plaintiff in *Youssef*, who lost his official supervisory duties and many other responsibilities related to his former position through a "reassignment" that really was a significant demotion.[19]

In sum, Mokhtar fails to provide evidence of any adverse change to the terms, conditions, or privileges of her employment resulting from the Department's decision to cancel the module project, regardless of her personal preference for the project to have continued to completion or her dissatisfaction with the Department's decisionmaking.  *See Lester v. Natsios*, 290 F. Supp. 2d 11, 90 (D.D.C. 2003) ("Purely subjective injuries, such as dissatisfaction with reassignment, public humiliation or loss of reputation, or unhappiness over assigned duties are not adverse actions."); *Childers v. Slater*, 44 F. Supp. 2d 8, 19 (D.D.C. 1999) ("Mere inconvenience and alteration of job responsibilities will not rise to the level of an adverse action."); *see also Leon v. Dep't of Educ.*, No. 10-CV-2725, 2014 WL 1689047, at *13 (E.D.N.Y. Apr. 29, 2014) ("deprival of [plaintiff's] top-choice teaching assignment [and] exclusion from certain extracurricular school activities" did not rise "to the level of a materially adverse change in the terms and conditions of her employment").  Thus, rather than an adverse employment action, the project

---

[19]     A comparison with the facts in *Holcomb v. Powell*, 433 F.3d 889 (D.C. Cir. 2006), also is helpful.  There, the D.C. Circuit found that the plaintiff suffered an adverse employment action under Title VII when she had "experience[d] an extraordinary reduction in responsibilities that persisted for years" such that she "was performing tasks commensurate with a Grade 5 position — six grades below [her] Grade 11 Program Specialist position."  *Id.* at 902 (employer "concedes [plaintiff] was performing work well below her grade level").  Here, by contrast, Mokhtar has continued to engage in all the tasks and responsibilities ordinarily assigned to her as a Language and Culture Instructor, and the cancellation of one project did not "dramatically decline" her duties "in both quantity and quality," as in *Holcomb*.  *Id.*

cancellation is more accurately characterized as one of the many "ordinary tribulations of the workplace [that] employees should expect" and for which no statutory protection exists. *Lester*, 290 F. Supp. 2d at 29-30.  Accordingly, the Court grants summary judgment in favor of the Department on Mokhtar's ADEA age discrimination claim as to the cancellation of the project.

### 3.  Retaliation: Cancellation Of The Module Project

The Court next turns to Mokhtar's retaliation claims under Title VII and the ADEA based on the cancellation of the module project.[20]  To establish a prima facie case of retaliation under both statutes, a plaintiff must demonstrate that (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action by her employer; and (3) a causal connection existed between the two.  *See Broderick*, 437 F.3d at 1231-32; *see also Tomasello v. Rubin*, 167 F.3d 612, 619 (D.C. Cir. 1999) ("[T]he test for determining retaliation under the ADEA and Title VII is identical." (citation omitted)).  "A plaintiff has engaged in a protected activity if he or she has 'opposed any practice made an unlawful employment practice' by Title VII or the ADEA." *Nguyen v. Mabus*, 895 F. Supp. 2d 158, 183 (D.D.C. 2012) (citation omitted).

Though not specified in the complaint, the only protected activity for which Mokhtar can claim she was retaliated against is her filing of an EEO complaint in 1998 about her then-immediate supervisor Dr. Joseph White.[21]  *See, e.g.*, Mokhtar Depo, ECF No. 87-4, Ex. B. at

---

[20]    Because the Department fails to make a non-discriminatory justification argument in its motion for summary judgment, the Court again follows *McDonnell Douglas* here.

[21]    Mokhtar also testified that Dr. Bernhardt retaliated against her because he was jealous of her professional accomplishments and activities, but even if true, there is no suggestion that Mokhtar's professional accomplishments or activities amounted to "protected activity" for purposes of Title VII or the ADEA.  *See, e.g.*, Mokhtar Depo. ECF No. 87-4, Ex. B at 173:4-174:11, 179:15-20, 181:19-182:18.  The same holds true for Mokhtar's testimony that she was retaliated against for applying to other jobs within the Department.  *See id.* at 180:14-21.  In addition, Mokhtar appears to suggest that the module project was cancelled in retaliation for her filing the March 2, 2011, EEO complaint, *see* ROI Excerpts, ECF No. 87-3, Ex. A at 25, but the project was cancelled before the EEO complaint was filed, and in fact, the cancellation claim

173:4-174:11 (stating that "underlying activity" for retaliation claim is EEO complaint in "1998

or [19]99" about Dr. White); *id.* at 181:19-182:18 (agreeing that the "foundation of [the] reprisal

complaint" is the 1998 EEO complaint and there are "no" other activities that form the basis of

this claim); *see also Holcomb*, 433 F.3d at 902 (filing formal EEO complaint constitutes

protected activity).  In turn, the Department's motion for summary judgment focuses on the third

element of a retaliation claim by arguing that Mokhtar "proffers no evidence of a causal

connection between the 1998 EEO complaint and any of the Department's acts of omissions

twelve years later."  Def.'s Mem. Supp. Mot. Summ. J., ECF No. 87-2, at 17-18.

     A retaliation claim requires "proof that the desire to retaliate was the but-for cause of the

challenged employment action."  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, --- U.S. ---, 133 S. Ct.

2517, 2528 (2013).  In other words, "traditional principles of but-for causation" apply, and the

plaintiff must show that "the unlawful retaliation would not have occurred in the absence of the

alleged wrongful action or actions of the employer."  *Id.* at 2533.  In some cases, causation can

be established simply by showing that "the employer had knowledge of the employee's protected

activity, and the adverse personnel action took place shortly after that activity."  *Pardo-*

*Kronemann v. Jackson*, 541 F. Supp. 2d 210, 218 (D.D.C. 2008) (citation, quotation, and

alteration omitted).  This is not one of those cases, however, because courts "have found that a

three to four month gap between the protected activity and the adverse employment action is too

great to establish an inference of causation, when premised on temporal proximity alone" —

making the twelve-year gap here far too long.  *Davis v. George Washington Univ.*, No. 12-CV-

---

was included within the complaint, hence the Court's conclusion that the claim was exhausted.
An act preceding the EEO complaint cannot serve as the predicate for a retaliation claim.  *See*
*Lewis v. District of Columbia*, 653 F. Supp. 2d 64, 79 (D.D.C. 2009) ("The fact that the allegedly
retaliatory actions preceded the protected activity precludes a determination that the protected
activity caused the defendant to retaliate against the plaintiff." (citations omitted)).

1431 (RC), 2014 WL 1100232, at *20 (D.D.C. Mar. 20, 2014) (citations omitted); *see also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (per curiam) (citing with approval circuit cases rejecting temporal proximity of three and four months as evidence of causation); *Mayers v. Laborers' Health and Safety Fund of N. Am.*, 478 F.3d 364, 369 (D.C. Cir. 2007) (eight-month gap between protected activity and adverse employment action was "far too long" to infer causation); *Hammond v. Chao*, 383 F. Supp. 2d 47, 59 (D.D.C. 2005) ("year-and-a-half gap is too great to permit temporal proximity alone to establish a causal connection").

Instead, the more "time that elapses between the protected activity and the alleged acts of retaliation,… the more difficult it is to demonstrate any causal connection." *Saunders*, 1998 WL 525798, at *5. Thus, something much stronger is needed to create a reasonable inference of a causal connection when the temporal proximity inference fails, beyond the mere fact that the employer knew of the protected activity. *Cf.* Bernhardt Depo., ECF No. 100-1, Ex. 2 at 7:12-14 (admitting awareness of 1998 EEO complaint). But Mokhtar does not provide any evidence suggesting a link or retaliatory pattern between any of the complained-about actions by the Department, including cancelling the project, and her EEO complaint from more than a decade earlier.[22] *Cf., e.g., Davis*, 2014 WL 1100232, at *20 (plaintiff established causation when he did

---

[22]     Cases in this Circuit consistently have found a lack of causal connection when a year or more has passed between the protected activity and the alleged adverse action; the twelve-year gap here is, of course, significantly more attenuated than even those scenarios. *See, e.g., Manuel v. Potter*, 685 F. Supp. 2d 46, 68 (D.D.C. 2010) (no causal connection when alleged adverse action occurred "nearly two years after [plaintiff] engaged in the protected activity"); *Singleton v. Potter*, 402 F. Supp. 2d 12, 40 (D.D.C. 2005) ("any inference of causal connection is … unwarranted" given three-year gap between plaintiff's complaint and suspension); *Brown v. Tomlinson*, 383 F. Supp. 2d 26, 31 (D.D.C. 2005) ("a five to six year gap between the filing of plaintiff's EEO complaint and the adverse employment actions at issue in this case does appear to be much too long to infer a causal connection between the two events"); *Saunders*, 1998 WL 525798, at *5 (when eight to ten years had passed between EEO activity and the adverse action, a causal connection was not demonstrated); *Garrett v. Lujan*, 799 F. Supp. 198, 202 (D.D.C. 1992) (almost a year "between plaintiff's EEO activity and the adverse employment decision is

"not rely solely on temporal proximity to evidence retaliation" but rather "also claim[ed] that Defendant engaged in a pattern of retaliation — every time Plaintiff requested FMLA leave, he was terminated shortly thereafter"); *Walker v. England*, 590 F. Supp. 2d 113, 139-40 (D.D.C. 2008) (plaintiff established "pattern of antagonism" by showing connection between protected activity and a series of adverse actions).

Further, an inference of causation is especially unlikely when the person who allegedly retaliated against Mokhtar years later (*i.e.*, Dr. Bernhardt) was not the subject of her 1998 EEO complaint (*i.e.*, Dr. White).  *See Vickers v. Powell*, 493 F.3d 186, 195-96 (D.C. Cir. 2007) (expressing skepticism about plaintiff's allegation that an official "might be lying to hide his retaliatory motive" when the official was not involved in or the subject of plaintiff's prior EEO activities).  In fact, Mokhtar admits that since rejoining the FSI from overseas, no Department employee has made a comment about her prior EEO activity, which, though not dispositive, strongly gestures at the underlying weakness of her claim.  *See* Mokhtar Depo., ECF No. 87-4, Ex. B at 188:7-14.  Accordingly, without evidence supporting any reasonable inference of causation, Mokhtar fails to meet her burden, and the Court therefore grants summary judgment for the Department on the Title VII and ADEA retaliation claims as to the project.[23]

---

too great [a length of time] to support an inference of reprisal").

[23]     Alternatively, Mokhtar ignores the Department's causation argument in her opposition brief, thus conceding the issue.  *See, e.g.*, *Burke v. Inter-Con Sec. Sys., Inc.*, 926 F. Supp. 2d 352, 356 (D.D.C. 2013) (plaintiff conceded arguments raised in defendant's motion for summary judgment by failing to oppose those arguments in plaintiff's opposition memorandum and sur-reply); *Malik v. District of Columbia*, No. 05-1374, 2008 WL 628544, at *2 (D.D.C. Mar. 10, 2008) (granting defendant's summary judgment motion as conceded when plaintiff failed to oppose arguments).

## C.  Hostile Work Environment

Though it is not entirely clear that Mokhtar is alleging a hostile work environment claim in this case, the Court liberally construes her complaint to include such a claim.[24]  Courts apply the same analysis when evaluating a hostile work environment claim under Title VII and the ADEA.  *See, e.g.*, *Blackwell*, 2014 WL 3834984, at *9 n.9.  As such, to establish a prima facie hostile work environment claim under either statute, the plaintiff must show, among other things, that she was subjected to unwelcomed harassment that was so severe and pervasive that it affected a term, condition, or privilege of employment and created a hostile work environment. *See Gray v. Foxx*, No. 11-2188, 2014 WL 5823090, at *13 (D.D.C. Nov. 10, 2014); *Peters v. District of Columbia*, 873 F. Supp. 2d 158, 188-89 (D.D.C. 2012).  The Department moves for summary judgment on the basis that Mokhtar fails to provide evidence establishing this element. *See* Def.'s Mem. Supp. Mot. Summ. J., ECF No. 87-2, at 21.

To determine whether a hostile work environment exists, courts consider "all the circumstances," including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating…; and whether it unreasonably interferes with an employee's work performance."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).  "[I]solated incidents (unless extremely serious)" are usually insufficient, *Faragher*, 524 U.S. at 788, and the conduct must be more than "merely offensive."  *Harris*, 510 U.S. at 21.  Accordingly, a hostile work environment claim must be based on incidents comprising "one unlawful employment practice" of intimidation, insult, and ridicule that pervades the plaintiff's day-to-day working

---

[24]     During the administrative process, the Department accepted for investigation a hostile work environment claim "characterized by, but not limited to, false accusations," though there was confusion about what those "false accusations" were. *See* ROI Excerpts, ECF No. 87-3, Ex A at 16; Final Agency Decision, ECF No. 87-8, Ex. F at 4.  Nonetheless, the Department does not raise an exhaustion defense as to the scope of the hostile work environment claim.

life.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 118 (2002); *Harris*, 510 U.S. at 21-

22; *see also Singletary v. District of Columbia*, 351 F.3d 519, 527 (D.C. Cir. 2003) (plaintiff

must demonstrate that "the acts about which [she] complains are part of the same actionable

hostile work environment practice").

Liberally construing the compliant, Mokhtar appears to allege that the following events

created a hostile work environment: the "Not Successful" performance ratings; new FSI

employees are "too young" and are "not professionally dressed"; Dr. Elrayah "made" Mokhtar

sign a document stating that she would get recertified; Dr. Bernhardt persuaded employees to

prevent Mokhtar from getting recertified; Dr. Bernhardt required employees to implement his

policies and follow his instructions; Mokhtar was not permitted to complete the consular module

project; Dr. Bernhardt did not involve Mokhtar in developmental assignments; Dr. Bernhardt

attempted to prevent Mokhtar from volunteering for positions outside of the FSI in 2007 and

2008; Dr. Bernhardt did not assign unspecified projects to Mokhtar; and Dr. Bernhardt did not

select Mokhtar for two unspecified supervisory positions.  *See generally* Compl., ECF No. 1.

As an initial matter, there is no competent evidence in the record to support several of

Mokhtar's allegations, while, at the same time, there is evidence that directly contradicts other

allegations.  For example, Mokhtar alleges that Dr. Elrayah "made" her sign a document,

presumably the mid-year performance review form, which stated that Mokhtar would get

recertified by the end of the year.  *See* Compl., ECF No. 1 at 3; ROI Excerpts, ECF No. 87-3, Ex.

A at 118 (mid-year review).  There is no evidence, however, of any intimidation or coercion by

Dr. Elrayah when Mokhtar signed the review form; rather, Mokhtar has testified to the exact

opposite — that Dr. Elrayah did not intimidate her into signing the form and that she voluntarily

signed it because she believed that she could meet the end-of-year deadline.  *See* Mokhtar Depo.,

ECF No. 87-4, Ex. B at 84:20-85:22, 119:2-20 ("Q: Did you find [Dr. Elrayah's] behavior

intimidating?  A: No.  Because at the time I had no doubts that I can meet the deadline."); *see*

*also* Mokhtar Depo. ECF No. 100-1, Ex. 3 at 86:6-11 (stating that she signed the form to make

her supervisor "happy" and because she had "no doubt that [she] would be able to meet" the

deadline).

In addition, there is no evidence regarding how new employees dressed at the FSI or why

they were "too young," but even if such evidence existed, these facts would not impact Mokhtar.

There also is no evidence about how Dr. Bernhardt acted improperly by requiring employees to

implement his policies and follow his instructions, which any supervisor would expect, nor is

there evidence about why this would be discriminatory towards Mokhtar anyways.  *See, e.g.*,

Mokhtar Depo., ECF No. 100-1, Ex. 3 at 172:7-11 (stating merely that Dr. Bernhardt is "the only

one who speaks for the section" and "who makes decisions in the section"); ROI Excerpts, ECF

No. 87-3, Ex. A at 27 ("No one else's opinion matters[.]  [Dr. Bernhardt] is the only one who

runs everything in the section."); *cf.* Aziz Depo., ECF No. 100-1, Ex. 1 at 15:16-18 ("There is a

better way to [run the section,] … but there's no specific thing that I can say I see corruption.").

Likewise, besides the module project, there is no evidence of Dr. Bernhardt failing to

involve Mokhtar in other developmental assignments or projects.  The Court, moreover, already

rejected Mokhtar's claim that a retaliatory motive was behind the project cancellation, and the

Court also has rejected Mokhtar's suggestion that there was a conspiracy led by Dr. Bernhardt to

prevent her from getting recertified, as no competent evidence in the record supports such a

claim.  Nor is there any competent evidence in the record that Dr. Bernhardt prevented Mokhtar

from volunteering for positions in 2007 and 2008, as Mokhtar testified that Kathy Russell

decided who could volunteer for the Iraq position and who could return to work at the FSI after

volunteering, and there is no evidence of Dr. Bernhardt's involvement other than Mokhtar's

conclusory testimony that Dr. Bernhardt must have convinced Russell not to let Mokhtar

volunteer and not to grant Mokhtar a reemployment letter so she could return to the FSI.  *See*

Mokhtar Depo., ECF No. 100-1, Ex. 3 at 170:1-172:14.  Finally, both supervisory positions to

which Mokhtar applied were outside the FSI, which suggests that no FSI employees, including

Dr. Bernhardt, were involved in the selection processes, and regardless, the non-selections

occurred in 2007 and 2008, several years before the relevant events in this lawsuit.  *See* Mokhtar

Depo., ECF No. 87-4, Ex. B at 179:23-180:20.

       But even looking past the fact that nearly all of the underlying allegations either lack

evidentiary support or were rejected on other grounds by the Court, Mokhtar still falls well short

of meeting her prima facie burden because none of the acts she alleges, whether considered alone

or cumulatively, come close to meeting the demanding standard for a hostile work environment

claim.  In particular, "even genuinely troublesome conduct" — very little, if any, of which

Mokhtar has established in this case — generally "is not sufficient when the incidents are

[isolated] and spread out over a period of years, as is the case here," where Mokhtar alleges

various unrelated slights between 2007 and 2011.  *Brantley v. Kempthorne*, No. 06-1137, 2008

WL 2073913, at *8 (D.D.C. May 13, 2008); *see also Akonji v. Unity Healthcare, Inc.*, 517 F.

Supp. 2d 83, 97-99 (D.D.C. 2007) (granting summary judgment for employer despite five

incidents of sexual harassment over two-year period, including physical acts such as unconsented

touching of the plaintiff).  Instead, the events about which Mokhtar complains merely are "the

ordinary tribulations of the workplace" and not the type of pervasive or "extreme" conduct that

creates a hostile work environment.  *Faragher*, 524 U.S. at 788.

In fact, these events are hardly indicative of workplace discrimination to begin with, let alone evidence of "a work environment that was pervaded by discrimination," as is required to sustain a claim.[25] *Singh v. U.S. House of Reps., Comm. on Ways & Means*, 300 F. Supp. 2d 48, 56 (D.D.C. 2004); *Ey v. Office of Chief Admin. Officer of U.S. House of Reps.*, 967 F. Supp. 2d 337, 346 (D.D.C. 2013) (rejecting hostile work environment claim when allegations of harassment did not "suggest[] anything untoward, let alone discriminatory animus," and the plaintiff did "not even allege that this interaction was inappropriate or discriminatory"); *see also* Mokhtar Depo., ECF No. 87-4, Ex. B at 186:17-188:2-21 (testifying that no Department employee has made a comment about her age or the 1998 EEO complaint, and that she has never heard rumors of people talking about her age or prior EEO activity).  Accordingly, the Court grants summary judgment for the Department on Mokhtar's hostile work environment claim.

*        *        *

In conclusion, the Court finds that Mokhtar failed to exhaust many of the allegations in her complaint before filing this lawsuit, and those remaining claims that she did exhaust fail on the merits either because the Department offers unrebutted non-discriminatory reasons for its decisions or because Mokhtar does not provide competent evidence to establish the necessary prima facie elements for her claims.  As such, at the end of the day, none of Mokhtar's claims survive the Department's motion for summary judgment.

---

[25]     Alternatively, Mokhtar's opposition brief ignores the Department's arguments for summary judgment on the hostile work environment claims, and Mokhtar therefore concedes the issues.  *See, e.g.*, *Burke*, 926 F. Supp. 2d at 356; *Malik*, 2008 WL 628544, at *2.

## V.  CONCLUSION

For the foregoing reasons, the Court **grants** the Department's motion for summary judgment.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 13, 2015                                          RUDOLPH CONTRERAS
                                                                United States District Judge